

# In the Missouri Court of Appeals
## Western District

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| Respondent, | ) | |
| v. | ) | WD80945 |
| | ) | |
| JOANTHONY DEAUNDRE JOHNSON, | ) | |
| Appellant. | ) | FILED: March 5, 2019 |

## APPEAL FROM THE CIRCUIT COURT OF BOONE COUNTY
### THE HONORABLE JEFF HARRIS, JUDGE

### BEFORE DIVISION THREE: MARK D. PFEIFFER, PRESIDING JUDGE,
### LISA WHITE HARDWICK AND ANTHONY REX GABBERT, JUDGES

Joanthony Johnson was convicted by a jury of two counts of first-degree sodomy, two counts of first-degree rape, and one count of attempted first-degree sexual abuse and sentenced to 100 years in prison. He brings five points on appeal. In Points I-III, he contends the circuit court erred in admitting evidence from his cell phone because the search of the phone was invalid under the Fourth Amendment and the compulsion of his phone's passcode violated his Fifth Amendment privilege against self-incrimination. In Point IV, Johnson argues that the court erred in denying his motion for improper joinder and severance of the charges. In Point V, he asserts that the evidence was insufficient to support his

conviction for attempted first-degree sexual abuse.  For reasons explained herein, we affirm.

## FACTUAL AND PROCEDURAL HISTORY

On the night of August 21, 2015, C.N., a college student, went with her roommates to The FieldHouse bar in Columbia.  C.N. got separated from her friends.  The next memory she had was of smoking "dabs," which are a condensed form of THC more potent than leaf marijuana, in the kitchen of Johnson's apartment.  C.N. remembered feeling sick to her stomach afterwards and holding onto the toilet in Johnson's bathroom.  Her head was spinning, and she thought she was going to vomit.  Johnson came into the bathroom, grabbed C.N.'s arm, told her she was fine, and tried to get her out of the bathroom.  She repeatedly told him that she did not feel well and wanted to be left alone, but he continued to grab her.  Johnson took C.N. into the bedroom.  C.N.'s next memory was of waking up, face down, on the bed the next morning.  Johnson was behind her, and she was unsure of what was happening.  After this, C.N. occasionally saw Johnson out at The FieldHouse and Roxy's, another Columbia bar.  She did not confront Johnson or report the incident to the police because she was unsure whether Johnson had done anything to her that night.

A few weeks later, on September 13, 2015, K.B., then nineteen years old, went to Willie's bar in Columbia with her friends, S.C. and J.L.  K.B. and S.C. met Johnson while sitting at the bar, and they drank shots with him.  They decided to accompany Johnson and his friend back to Johnson's apartment so they could buy

2

some Xanax and continue drinking. At the apartment, Johnson offered K.B. and S.C. cocaine. After the two women each snorted a line, they went to the bathroom together and questioned whether the substance Johnson had given them was actually cocaine.

Johnson, K.B., and S.C. went to another apartment to buy the Xanax. On the way to the apartment, S.C. started experiencing "really weird visuals." S.C. saw a rainbow grid, her vision became blurry, and she felt groggy. After buying the Xanax, Johnson gave K.B. and S.C. each a pill. K.B. took her pill, but S.C. did not take hers. The three went back to Johnson's apartment, where S.C. retrieved K.B.'s shoes and purse. When K.B. and S.C. announced their intention to leave at that time, Johnson insisted on accompanying them to the entrance of the apartment building. As they walked down the hallway, K.B. started "freaking out." She began crying, screaming, and crawling back down the hallway toward Johnson's apartment. Johnson took K.B. into his apartment, while S.C. went downstairs to try to find their friend J.L., who was attempting to call her.

By the time S.C. arrived in the lobby of Johnson's apartment building, her memory was getting fuzzy, and she felt like she was losing control of her muscles. She tried to go back upstairs to Johnson's apartment to find K.B., but she could not find the door to the stairwell. S.C. began rehearsing facts like her name and birthday and K.B.'s name and birthday. Finally, S.C. decided to sit in the lobby, where a couple found her. She gave her phone to the couple and asked them to

3

call J.L. and direct him to the building. The couple did so and also called the police.

When J.L. arrived, he went upstairs and began knocking on apartment doors before he was eventually directed to Johnson's apartment. J.L. knocked loudly and "assertively" on Johnson's door for ten to fifteen minutes. Johnson did not answer the door, even though J.L. could hear music or a television inside the apartment. J.L. explained who he was and said that he was looking for his friend, K.B. Johnson still did not answer the door. J.L. went downstairs and gave the police Johnson's apartment number. When the police went to Johnson's apartment, the police had to knock on his door for "a very long time" before Johnson finally came to the door.

When the police entered the apartment, Johnson unlocked the door to his bedroom. K.B. was lying on Johnson's bed. Because K.B. did not respond to the officers and appeared "heavily intoxicated" and "high on something," they called for an ambulance. K.B. was wearing camo pants and a baggy white T-shirt. The T-shirt was not on her properly, as only one arm was through a sleeve. The other arm was draped over the shirt, which caused K.B.'s armpit and the underside of her breast to be exposed when she tried to sit up. K.B.'s clothes were piled in a corner and appeared to have been peeled off of her, because her underwear was still inside of her pants. Johnson told the officer that he had removed K.B.'s clothes because she had vomited "everywhere" on them, but the officer did not

4

see any vomit on her clothes.  The officers found a jar of Vaseline on the table next to the bed.

The officers recovered a baggie from Johnson's living room that was labeled "4-ACO-DMT fumarate," which is a substance associated with hallucinogenic mushrooms.  The baggie was also marked, "Not for human consumption."  Residue from white powder was nearby and appeared to have been lined up with a credit card.  The officers collected the powder, but the powder blew away when it was taken outside for testing.  Due to an officer's mistakenly coding his report of the incident as a non-criminal matter, the police did not follow up or investigate the incident as a criminal matter.

A couple of months later, on November 19, 2015, T.T., then twenty-one years old, went to Roxy's bar and saw Johnson there.  T.T. had first met Johnson in late 2014 or early 2015.[1]  When T.T. encountered Johnson again at Roxy's on the evening of November 19, 2015, Johnson went to the bar multiple times and bought a shot and mixed drinks for her.  T.T. was not with Johnson when he got the drinks and could not see if he put anything in them.  Johnson invited T.T. and her friends to a party at his place after the bar closed.  After having three drinks, T.T. went outside the bar to smoke a cigarette.  T.T.'s next memory was tripping while walking with Johnson near a parking garage.  Johnson held on to T.T. and told her, "Come on."  The next thing T.T. remembered was waking up at around

---

[1] During their earlier meeting, T.T. and a friend went to Johnson's apartment, where T.T. and Johnson had consensual sex.

5

6:30 or 7:00 a.m. in Johnson's bed. She was lying on her stomach and wearing nothing but her bra and underwear. T.T. had no memory of taking off her clothes. T.T. asked Johnson if there had been a party, and he said no one but her had come to the apartment. T.T. felt "very weird, weird and groggy," but she did not feel hungover. Although she had consumed alcohol in the past, she had never before blacked out from drinking. Her body was sore, and her neck felt as though someone had choked her. T.T. found a bruise on the back of her thigh that looked like the imprint of three fingers. T.T. did not report the incident to the police because she was not sure what had happened.

Two and a half months later, in the early morning hours of February 4, 2016, M.V., then seventeen years old, met Johnson outside of The FieldHouse. M.V. and her friend, H.J., had been drinking at the bar using fake IDs. M.V. had also snorted cocaine while inside the bar. Outside the bar, Johnson offered to provide M.V. and H.J. some dabs at his apartment. They agreed to go and went with him and two other women to Johnson's apartment.

Once inside the apartment, M.V. and H.J. smoked the dabs that Johnson gave them. Johnson also mixed drinks for M.V. The two other women eventually left, and M.V. and H. J. fell asleep on Johnson's couch. M.V. got up during the night and tried to find something to eat. She ate three chocolate peanut butter balls from a bag that she found in Johnson's refrigerator. M.V.'s next memory was of waking up and feeling hazy. She thought someone had spiked her drink,

and she tried to get H.J. to wake up but was unsuccessful. M.V. passed out again. When she woke up, she felt lethargic and totally out of it.

At that point, Johnson came out of his bedroom. M.V. told him that she wanted to go to the doctor. She repeatedly told him that someone had put something in her drink. Johnson told her she was fine, grabbed her by her waist, and walked her into his bedroom. M.V. knew that Johnson was going to take advantage of her because she was not in control of her body.

Johnson laid M.V. down on his bed and removed her spandex shorts. He then climbed on top of her and had vaginal intercourse with her. M.V. had no ability to resist him because she felt so weak and could not do anything other than make unhappy grunting noises. Johnson appeared to be turned on by those noises and went faster. According to M.V., the effects that she was feeling were worse than she had experienced when she had taken acid on prior occasions. She seized, twitched, and hit herself, and she also kept passing out and regaining consciousness. M.V. passed out after Johnson had finished raping her the first time. When she woke up, Johnson grabbed her, put her face down on the bed, and had intercourse with her again. This time, M.V. was able to tell him to stop and was crying. Johnson seemed to enjoy her crying and went faster. M.V. continued to seize, twitch, and pass in and out of consciousness.

M.V. and H.J. left Johnson's apartment sometime after 7:00 a.m. M.V. told H.J. that she thought Johnson had raped her. As H.J. drove her home, M.V. felt lethargic and was still seizing, twitching, and hitting herself. H.J. called M.V.'s

7

father and told him that someone had raped M.V. M.V.'s father took her to a hospital as soon as she got home. At the hospital, M.V. was disoriented, had trouble concentrating during the examination, and frequently lost her train of thought mid-sentence. She was groggy and swaying back and forth, her speech was slurred, and she fell asleep in the middle of a conversation with a sheriff's deputy.

Johnson's DNA was found in semen recovered from M.V.'s cervix and anus. Testing of M.V.'s blood showed the presence of alcohol, THC, cocaine, and Psilocin, which is a substance commonly found in hallucinogenic mushrooms.

The court issued a search warrant for Johnson's apartment on February 19, 2016. The warrant was executed on February 22, 2016, and an iPhone was then seized from the apartment. The iPhone could not be searched at that time because it was locked.

Meanwhile, the State charged Johnson with one count of first-degree rape for knowingly having sexual intercourse with M.V., a person who was incapable of consent. The State also charged him with two counts of felony possession of a controlled substance, specifically, more than five grams of marijuana and hallucinogenic candies or dabs, with the intent to distribute.

While the charges against Johnson for the incident involving M.V. were pending, the police were able to search Johnson's iPhone on October 28, 2016. On Johnson's phone, the police found three videos showing him having anal intercourse with C.N. and two videos showing Johnson having oral sex and vaginal

8

intercourse with T.T. Neither C.N. nor T.T. made any sounds during the videotaped sexual encounters. The police showed C.N. and T.T. the videos, and the two women said that they did not consent to any sexual contact with Johnson on those occasions. Johnson's phone also contained texts that Johnson sent to friends during and after the incident with M.V. and H.J. In one of the texts, which Johnson sent when he first arrived at his apartment with M.V. and H.J., Johnson stated that he was "about to finally get some pussy." In another text that Johnson sent a few hours after M.V. left his apartment, Johnson said that he "[m]ade a porno." Additionally, Johnson's phone contained a brief video of M.V. and H.J. sleeping in his apartment.

The State subsequently filed a five-count amended indictment against Johnson. Count I alleged that Johnson committed first-degree sodomy on August 22, 2015, by knowingly having deviate sexual intercourse with C.N. Count II alleged that Johnson committed attempted first-degree sexual abuse on September 14, 2015, by removing K.B.'s clothing, which was a substantial step toward the commission of the crime of first-degree sexual abuse and was done for the purpose of committing such abuse. Count III alleged that Johnson committed first-degree sodomy on November 20, 2015, by knowingly having deviate sexual intercourse with T.T. Count IV alleged that Johnson committed first-degree rape on November 20, 2015, by knowingly having sexual intercourse with T.T. Lastly, Count V alleged that Johnson committed first-degree rape on February 4, 2016, by knowingly having sexual intercourse with M.V. Counts I, III, IV, and V alleged that

9

the victims were incapable of consent because they were in a drug-induced state and were known by Johnson to be unable to make a reasonable judgment as to the nature or harmfulness of the sexual acts.

Trial was held in April 2017. Johnson testified in his defense that C.N., T.T., and M.V. were conscious during the sexual acts and that all of the sexual encounters were consensual. Johnson admitted that, in addition to videotaping himself having sex with C.N. and T.T., he videotaped himself having sex with M.V. He did not save the video of M.V. to his phone, however, but instead sent it to a friend via Snapchat. Johnson admitted that none of the women were aware he was videotaping them. Johnson denied attempting to sexually abuse K.B. He first testified on direct examination that he helped K.B. take off her clothes and put on his clothes because she had urinated on herself. On cross-examination, however, he acknowledged that he told the police that he had taken off K.B.'s clothing by himself because she had vomited on them. Johnson also testified that he was "very knowledgeable" about the different forms of hallucinogenic mushrooms and their effects. He admitted that he had mixed cocaine with the 4-ACO-DMT fumarate in the plastic bag that police found in his apartment on the night of the incident with K.B.

The jury found Johnson guilty on all charges. The court sentenced him as a persistent misdemeanor offender to four years in prison for attempted sexual abuse and twenty-five years in prison for each of the two rape and two sodomy counts. The sentences on the rape and sodomy counts were ordered to run consecutively

10

to each other and concurrently to the attempted sexual abuse sentence, for a total of 100 years.  Johnson appeals.

ANALYSIS

**I. Fourth and Fifth Amendment Challenges to Cell Phone Evidence**

Johnson's first three points on appeal concern the circuit court's denial of his motion to suppress evidence obtained from his seized cell phone.  In Point I, he contends the search warrant was invalid under the Fourth Amendment because it was not supported by probable cause, was not sufficiently particular, was overbroad, and was stale when the search of the phone was executed.  In Point II, he asserts he did not consent to the search of his phone.  In Point III, Johnson argues the court violated his Fifth Amendment privilege against self-incrimination when it compelled him to enter his passcode to unlock the phone so that the State could examine it.

Our review of the circuit court's ruling on a motion to suppress is limited to determining whether there is substantial evidence to support the court's decision. *State v. Maples*, 551 S.W.3d 634, 643 (Mo. App. 2018).  We will reverse the ruling only if we find that it is clearly erroneous. *Id*.  A ruling is clearly erroneous "if this court is left with a definite and firm belief a mistake has been made." *Id*. (internal citations and quotations omitted).  In making this determination, we review the evidence in the light most favorable to the ruling, disregarding any contrary evidence and inferences. *Id*.  While we defer to the circuit court's factual

11

findings, we review issues of law *de novo*. *State v. Gaw*, 285 S.W.3d 318, 320 (Mo. banc 2009).

### A. Facts Surrounding Search of Cell Phone

The police seized Johnson's cell phone from his apartment under a search warrant issued on February 19, 2016. The warrant authorized police to search and seize:

> Illegal controlled substances, and drug paraphernalia. All bedding materials (i.e. sheets, mattress pads, comforters, blankets, pillow cases etc). All cell phones, electronic tablets, computers, digital media storage devices (hard drives, USB devices), (and to conduct an off-premises examination/search of said devices for all data/software as defined by RSMO 556.063) pertaining to the offense [of] Distribution Deliver and Manufacture of a Controlled Substance RSMO 195.211, and Rape in the First Degree RSMO 566.030.

The warrant further provided:

> This Court grants permission to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described herein, including conducting an off-site examination. This Court further grants permission to continue the forensic examination beyond the time at which the return of the search warrant is made to this court.

In the warrant, the court stated that, "from the sworn allegations of said complaint and from the supporting written affidavits filed therewith [this court] has found that there is probable cause to believe the allegations of the complaint to be true and probable cause for the issuance of a search warrant herein."

The affidavit accompanying and incorporated into the warrant was completed by Detective Patrick Corcoran of the Columbia Police Department. In

12

the affidavit, Corcoran described in detail the alleged incidents involving K.B. and M.V. He also described an alleged incident involving another woman, M.S. Approximately two months before the incident with K.B., M.S. filed a complaint alleging that she had gone to Johnson's apartment to buy marijuana and Xanax from him. M.S. told the police that she used the substances while at his apartment and that, afterwards, Johnson took advantage of her sexually. According to M.S., this happened to her multiple times.

After describing the alleged incidents involving K.B., M.V., and M.S., Corcoran then averred:

> It is likely, based on this ongoing criminal history, Johnson has illegal controlled substances, paraphernalia, and the bedding used during the rape of M.V. stored at this address. It is also likely Johnson has[ ] cellular phones, digital media storage devices, computers, electronic tablets, which may be used in the procurement and distribution of controlled substances stored at this address.

> From my training and experience, I know suspects use cellular phones, computers, and electronic tablets[ ] to store illegal content and carry out illegal activity, such as Felony Drug Possession RSMO 195.202, Distribution Deliver and Manufacture of a Controlled Substance RSMO 195.211. Based on M.V.'s description Johnson also used his phone to look up her condition during the sexual attack.

> From my training and experience, I know that cellular phones, and electronic tablets, contain a multitude of electronic capabilities very similar to a computer. Some of the above listed devices have the ability to search the internet, obtain and send e mails, take photos, and access social media applications. They also have the ability to retain memory of captured items even after they are deleted. The information stored within these devices is perishable and can be unrecoverable as new items write over the deleted items. Much of

13

this information, including the deleted data, is available only through a forensic examination of the phone. From my training and experience I know that suspects often use cellular phones and other electronic devices to conduct illegal activities. These devices often store that information so that it can be accessed at a later time even when it has been deleted.

Police executed the warrant on February 22, 2016, and seized Johnson's phone. The phone could not be searched at that time because it was locked.

In March 2016, Johnson filed a motion to preserve electronic evidence and to allow the defense's expert to examine Johnson's phone before the State examined it. In the motion, Johnson asserted that his phone "might contain exculpatory information" and that, "[i]f a minimally trained person attempts to extract data from the cell phone, any exculpatory evidence could be destroyed." He requested that the court enter an order prohibiting the State from testing the phone until after he had a chance to extract and examine the data on the phone. The court granted Johnson's motion. The parties agreed that both Johnson's and the State's examination of the cell phone would "all be done at once."

At the start of a pretrial conference on October 24, 2016, the parties again discussed the cell phone examination, which had not yet occurred. The State informed the court that its expert was planning to go to St. Louis that day to observe the defense expert's examination of the phone. The State said that its expert believed that, based upon the type of cell phone and the type of analysis that the defense's expert was planning to perform, there was an "extreme likelihood" that the contents of the phone would be "wiped clean," meaning

14

erased, by the defense expert's examination. The State advised that it was planning to proceed to trial "with nothing from the phone,"[2] but it wanted to inform the court and the parties of the possibility that Johnson's phone could be erased.

After discussing other matters during the same pretrial conference, the court and the parties returned to discussing the cell phone examination. Defense counsel explained that the reason there was a chance that the phone might be erased was because law enforcement had attempted to enter several passcodes but was unsuccessful in unlocking the phone, and any more attempts might cause the phone to reset. Defense counsel stated that she had just spoken to her expert, Greg Chatten, who told her that law enforcement was threatening to charge him with destruction of evidence if he did the extraction that day and the phone reset. Both the court and the State reassured defense counsel that Chatten would not be charged with spoliation or destruction of evidence and that everyone understood that the there was a possibility that Chatten's examination of the phone might cause it to reset.[3] Chatten's examination did not take place that day, however, because defense counsel was concerned about the possible destruction of evidence.

---

[2] At this point, the only charges pending against Johnson were based upon the incident with M.V., as the police had not yet seen Johnson's cell phone videos of C.N. and T.T.

[3] The record indicates that, because Chatten did not have Johnson's passcode at that time, he was planning to use a program that would essentially try several different passcodes on the phone until it got the right one. After ten failed passcode attempts, however, the phone would be erased and reset.

Instead, defense counsel requested that the State make the phone available at the Boone County Jail so that Johnson could use his thumbprint to unlock the phone for Chatten's examination. The State agreed, so long as Johnson agreed to use his thumbprint so the State's expert could perform his examination. Defense counsel stated that she had not talked to Johnson about using his thumbprint to unlock the phone but that he had previously indicated that he would consent to doing that.

Consequently, four days later, on October 28, 2016, Johnson, defense counsel, Chatten, Corcoran, and Jeff Adams, who was a mobile forensic examiner for the Columbia Police Department, met at the Boone County Jail to conduct the examinations of Johnson's cell phone.[4] Adams understood that Johnson had agreed to unlock the phone so that Chatten could examine the contents of the phone and then Adams could examine the contents of the phone. Adams initially asked Johnson to use his thumbprint to unlock the phone. Johnson's attempt to unlock the phone using his thumbprint failed, so he entered his passcode. Adams watched as Johnson entered his passcode, and Adams wrote down Johnson's passcode. Chatten then downloaded the phone's contents. Chatten's download took approximately ten minutes. During Chatten's examination, the phone

---

[4] Adams is trained and certified in using Cellebrite, a software and hardware tool that is used to obtain a forensic image, or copy, of the exact contents of a cell phone or mobile device. Cellebrite recovers all of the device's "logical data," including all text messages, phone calls, photographs, and videos. Adams could not examine the contents of Johnson's phone when it was initially seized because, at that time, Cellebrite was unable to bypass the passcode on that particular model of iPhone.

16

automatically locked, but it did not prevent the defense's download from being completed. After Chatten's examination was concluded, Adams asked Johnson to reenter the passcode to unlock the phone so that he could perform the State's examination. When Johnson refused to reenter his passcode, Corcoran told him that the State had a right to the evidence and that the State might seize Chatten's computer with the downloaded contents of Johnson's phone. At that point, the parties agreed to call the court.

During the phone conference with the court, the State asked the court for a motion to compel Johnson to enter his passcode into the phone. In response, defense counsel acknowledged that she and the State had agreed that, after Chatten's examination of the phone, the State would be able to do its examination. Nevertheless, defense counsel argued that she made that agreement without knowing that the phone would lock again and that Johnson would have to reenter his passcode for Adams to perform his examination. When the court asked defense counsel why, in light of the fact that defense counsel had already agreed to allow the State to perform its examination after Chatten's examination, it would matter that Johnson would have to reenter his passcode to allow the State to do so, defense counsel did not provide a reason. Finding that counsel for the State and the defense had previously agreed that the State could examine the phone following Chatten's examination, the court granted the motion to compel Johnson to enter his passcode to unlock the phone.

17

Johnson reentered his passcode, and Adams examined the phone. From the examination, the State police found the three videos showing Johnson having anal intercourse with C.N., the two videos showing Johnson having oral sex and vaginal intercourse with T.T., the texts that Johnson sent to friends during and after the incident with M.V., and the video of M.V. and H.J. sleeping.

Prior to trial, Johnson filed a motion to suppress physical evidence, including the cell phone seized from his apartment. The court held a hearing on the motion. Adams testified for the State. In addition to describing the October 28, 2016 examinations of Johnson's cell phone, Adams also testified about a recorded phone call Johnson had with an acquaintance on November 15, 2016, while he was in jail. During the call, which was played for the court, Johnson acknowledged that his counsel had made a "deal" with the State concerning the examination of his cell phone and that the court ordered him to reenter his passcode based upon this deal. Although Johnson represented that he did not know about the deal his counsel made allowing the State to examine his phone, he said he said he went along with it because he thought it was going to help him.

Following the hearing, the court entered its order denying Johnson's motion to suppress. In its order, the court found that the search warrant was supported by probable cause and properly permitted a search of the contents of the cell phone. The court also found law enforcement acted in good faith reliance on the warrant in executing it. The court rejected Johnson's argument that the warrant was stale by the time the phone was examined. Moreover, the court found that,

18

even if the warrant were invalid or stale, Johnson consented, through his counsel, to a search and examination of his phone.

The court further found that the "foregone conclusion" exception negated Johnson's argument that the compelled use of his passcode was testimonial and violated his Fifth Amendment rights. Specifically, the court found that the State knew a passcode existed, knew that Johnson possessed the passcode, and knew the passcode was authentic because the State saw Johnson use it to unlock his phone. Likewise, the State was aware, with reasonable particularity, that Johnson's phone contained relevant evidence, a fact that was bolstered by Johnson's desire to have his own expert examine the phone for exculpatory evidence and the discussions over several months between defense counsel and the State regarding the logistics of the cell phone examination.

At trial, the court granted Johnson a continuing objection with respect to his cell phone and the contents of the phone. Johnson included his claims of error regarding the admission of the cell phone evidence in his motion for new trial.

**B. Validity of Warrant under Fourth Amendment**

In Point I, Johnson contends the court clearly erred in denying his motion to suppress and admitting the cell phone evidence because the search warrant was not supported by probable cause, was not sufficiently particular, was overbroad, and was stale when it was executed.

"The Fourth Amendment protects the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and

19

seizures.'" *Davis v. United States*, 564 U.S. 229, 236 (2011) (quoting U.S. Const. amend. IV). A warrant is generally required to search the contents of a cell phone. *Riley v. California*, 573 U.S. 373, 134 S. Ct. 2473, 2493 (2014). Pursuant to constitutional and statutory law, a search warrant is invalid if it is issued without probable cause and if it does not describe the person, place, or thing to be searched or the property, article, material, substance, or person to be seized with sufficient particularity. *State v. Douglass*, 544 S.W.3d 182, 189 (Mo. banc 2018) (citing U.S. Const. amend. IV; Mo. Const. art. I, § 15; § 542.276.10(3) and (5), RSMo Cum. Supp. 2013).

### i. Probable Cause

To determine whether probable cause exists to issue a search warrant, a neutral judge or magistrate "is simply to make a practical, common-sense decision on whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *State v. Robinson*, 454 S.W.3d 428, 437 (Mo. App. 2015) (quoting *Illinois v. Gates*, 462 U.S. 213, 230 (1983) (internal quotations omitted)). "The presence of such contraband or evidence need not be established, at a *prima facie* level, by a preponderance of the evidence or beyond a reasonable doubt." *Id*. at 438 (internal citations and quotations omitted). A reviewing court's duty "is simply to ensure that the magistrate had a 'substantial basis' for concluding that probable cause existed." *Id*. (quoting *Gates*, 462 U.S. at 238).

20

In the affidavit filed in support of and incorporated into the warrant, Detective Corcoran averred that Johnson was suspected of committing the crimes of felony drug possession, distribution, delivery, and manufacture of a controlled substance, and first-degree rape. Corcoran described, in detail, the incidents reported by M.S., K.B., and M.V. In each incident, Johnson provided the victim with one or more controlled substances, including marijuana, Xanax, cocaine, and psychedelics, that rendered the victim either high or incapacitated. Johnson then either took advantage of the victim sexually (M.S.), undressed the victim before being interrupted by the police (K.B.), or had sexual intercourse with the victim multiple times (M.V.). Corcoran averred that, based upon this ongoing criminal history, it was likely that Johnson had a cell phone that "may be used in the procurement and distribution of controlled substances stored at this address." He stated that, based upon his training and experience, he knows that suspects use cell phones to store illegal content and carry out illegal activity such as felony drug possession and distribution, delivery, and manufacture of a controlled substance. Also, Corcoran explained that he knows that cell phones contain a multitude of electronic capabilities very similar to a computer, including the ability to search the internet, obtain and send e-mails, take photos, and access social media applications. Additionally, Corcoran averred that M.V. told police that Johnson also used his phone to look up her condition during the rape.

Under the totality of the circumstances, including Johnson's providing controlled substances to the victims during the incidents, Corcoran's knowledge

21

from his training and experience that suspects use cell phones to procure and distribute such controlled substances, and Johnson's accessing his cell phone during the rape of M.V., there was a substantial basis for concluding that there was a fair probability that the search of Johnson's cell phone would uncover evidence of the alleged drug offenses and the rape.  The warrant to search Johnson's phone was supported by probable cause.

### ii. Particularity and Breadth

"The Constitution limits searches by law enforcement to 'the specific areas and things for which there is probable cause to search,' and it requires that a search 'be carefully tailored to its justifications' and 'not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit.'" *United States v. Manafort*, 314 F. Supp. 3d 258, 263 (D.D.C. 2018) (quoting *Maryland v. Garrison*, 480 U.S. 79, 84 (1987)).  Therefore, search warrants must "'describe the items to be seized with as much specificity as the government's knowledge and circumstances allow, and warrants are conclusively invalidated by their substantial failure to specify as nearly as possible the distinguishing characteristics of the goods to be seized.'" *Douglass*, 544 S.W.3d at 192 (citation omitted).  "Specificity has two aspects:  particularity and breadth.  Particularity is the requirement that the warrant must clearly state what is sought.  Breadth deals with the requirement that the scope of the warrant be limited by the probable cause on which the warrant is based." *Manafort*, 314 F. Supp. 3d at 263-64 (citation omitted).  "The particularity requirement is met if the warrant's description enables

22

the searcher to reasonably ascertain and identify the items to be seized."

*Douglass*, 544 S.W.3d at 192 (internal citation and quotations omitted).

The warrant in this case provided that law enforcement could conduct an off-premises examination or search Johnson's cell phone "for all data/software as defined by RSMO 556.063 pertaining to the offense of Distribution Deliver and Manufacture of a Controlled Substance RSMO 195.211, and Rape in the First Degree RSMO 556.030." Section 556.063, RSMo Cum. Supp. 2013,[5] defined "data" and "computer software" as

> **"Data"**, a representation of information, facts, knowledge, concepts, or instructions prepared in a formalized or other manner and intended for use in a computer or computer network. Data may be in any form including, but not limited to, printouts, microfiche, magnetic storage media, punched cards and as may be stored in the memory of a computer[.]

> **"Computer software"**, digital information which can be interpreted by a computer and any of its related components to direct the way they work. Software is stored in electronic, magnetic, optical or other digital form. It commonly includes programs to run operating systems and applications, such as word processing, graphic, or spreadsheet programs, utilities, compilers, interpreters and communications programs[.]

§ 556.063(11) and (7). Johnson argues that this language was not sufficiently particular because it did not define the specific information it was seeking from the phone or limit the search to specific applications or functions on the phone.

---

[5] All statutory references are to the Revised Statutes of Missouri 2000, as updated by the 2013 Cumulative Supplement.

No Missouri court has addressed the particularity and breadth requirements relative to warrants authorizing the search of cell phones, but decisions from other jurisdictions offer guidance. Johnson is correct that there are cases holding that a warrant to search all data or all files on a cell phone is not sufficiently particular and is overbroad. *See, e.g*., *United States v. Wey*, 256 F. Supp. 3d 355, 385-88 (S.D.N.Y. 2017); *United States v. Winn*, 79 F. Supp. 3d 904, 918-22 (S.D. Ill. 2015); *State v. Henderson*, 854 N.W.2d 616, 634 (Neb. 2014). In so holding, these courts have explained that, given the Supreme Court's recognition in *Riley* that cell phones contain an immense storage capacity for potentially sensitive and private information, "'a heightened sensitivity to the particularity requirement in the context of digital searches' is necessary." *Wey*, 259 F. Supp. 3d at 383 (quoting *United States v. Galpin*, 720 F.3d 436, 447 (2d Cir. 2013)); *see also Henderson*, 854 N.W.2d at 288-89. Furthermore, law enforcement cannot possibly have probable cause to believe that *everything* on a cell phone is evidence of the suspected crime. *See Winn*, 79 F. Supp. 3d at 919-20. Hence, courts have found a warrant insufficiently particular if it does not limit the categories of data, *e.g.,* photos, videos, texts, call logs, or applications, that can be searched, *see, e.g., Winn*, 79 F. Supp. 3d at 919-20, and does not contain a temporal limitation on the data to be seized, *see, e.g.*, *Wey*, 256 F. Supp. 3d at 387-88.

Other cases, however, have held that the particularity requirement in a warrant authorizing the search of all data or all files in a cell phone is met so long as the warrant constrains the search to evidence of a specific crime. *See, e.g.,*

24

*United States v. Bishop*, 910 F.3d 335, 336-37 (7th Cir. 2018); *United States v. Castro*, 881 F.3d 961, 965 (6th Cir. 2018); *United States v. Bass*, 785 F.3d 1043, 1049-50 (6th Cir. 2015); *United States v. Zongli Chang*, 2018 WL 3640435 at *5 (E.D. Mich. July 31, 2018); *United States v. Grinder*, 2018 WL 2943235 at *4-5 (D. Md. June 12, 2018); *People v. English*, 52 Misc. 3d 318, 321 (N.Y. Sup. Ct. 2016). The rationale for holding that such warrants are sufficiently particular and not overbroad is that "[c]riminals don't advertise where they keep evidence." *Bishop*, 910 F.3d at 336. Indeed, "[a] warrant authorizing the search of a house for drugs permits the police to search everywhere in the house, because 'everywhere' is where the contraband may be hidden." *Id*. at 336-37. Moreover, in the context of electronic devices such as computers and cell phones, "'criminals can--and often do--hide, mislabel, or manipulate files to conceal criminal activity [such that] a broad, expansive search of the [device] may be required.'" *Bass*, 785 F.3d at 1049-50 (citations omitted). Because there is no way for law enforcement to know in advance how a suspect may label or code files that contain evidence of criminal activity, "by necessity government efforts to locate particular files will require examining many other files to exclude the possibility that the sought after data are concealed there." *English*, 52 Misc. 3d at 321-22. Just as a warrant authorizing a search of a filing cabinet allows the search of every document in the files because the incriminating evidence may be found in any file or folder, so too should a warrant allow the search of every document on a cell phone, which serves the same function as a filing cabinet. *Bishop*, 910 F.3d at 337 (citing *Andresen v.*

25

*Maryland*, 427 U.S. 463 (1976) and *Riley*, 134 S. Ct. at 2489). Thus, a warrant is sufficiently particular if it "cabins the things being looked for by stating what crime is under investigation." *Id*.

We find the reasoning of *Bishop*, *Bass*, *English*, and similar cases persuasive. The warrant in this case constrained the search of Johnson's phone to evidence of the specific crimes of distribution, deliver, and manufacture of a controlled substance and first-degree rape. The affidavit that was incorporated into the warrant described in detail the offenses that Johnson was suspected of committing and how cell phones could be used in the commission of those offenses. At the time the cell phone was seized, the officers could not have known where such evidence was located in the phone or in what format, such as texts, videos, photos, emails, or applications. Under the circumstances, the scope of the warrant was sufficiently particular and was not overbroad. *Bass*, 785 F.3d at 1050.

### iii. Staleness

There is no bright-line test for determining staleness. *State v. Valentine*, 430 S.W.3d 339, 344 (Mo. App. 2014). "[T]he likelihood that evidence sought is still in place is a function not of a watch or calendar, but of the character of the crime, of the criminal, of the thing seized or of the place searched." *State v. Wilbers*, 347 S.W.3d 552, 560 (Mo. App. 2011) (citation omitted). "As such, courts have been more tolerant of dated allegations when the evidence sought is of the sort that can reasonably be expected to be kept for long periods of time in the place to be searched." *Id*. (citation omitted).

26

A Pennsylvania court rejected a staleness argument in circumstances similar to those in this case. In *Commonwealth v. Knoble*, 188 A.3d 1199, 1201-02 (Pa. Super. Ct. 2018), police seized a cell phone in a consensual warrantless search on March 11, 2015. One month later, on April 13, 2015, police obtained a warrant to search the contents of the phone and conducted a data extraction. *Id*. at 1202. Nine months later, on January 12, 2016, police conducted a second data extraction on the phone. *Id*. at 1203. Police did not obtain a new search warrant to perform the second extraction. *Id*. In response to the defendant's staleness challenge on appeal, the Pennsylvania court found that "the facts and circumstances supporting the issuance of the April 13, 2015 search warrant remained unchanged at the time of the second extraction." *Id*. at 1207. Specifically, the court noted that the police had secured the phone when it was originally seized "to ensure that it remained in its original condition and that no one could alter its contents." *Id*. Additionally, the court noted that "the cell phone was in police custody during the entirety of the relevant period and remained unalterable." *Id*.

Similarly, in this case, Johnson's phone remained in police custody the entire time after it was seized. Adams's testimony indicates that, while the phone was in police custody, the device was turned off and was turned on only when he attempted to search the phone and found that it was locked. According to Adams, turning off the phone prevented it from being remotely erased.

27

Johnson makes much of the fact that the State offered evidence and argument that, while he was in jail, he asked one of his friends and his mother to either remotely lock the phone or erase evidence from it.[6] He argues that the State's raising this issue shows that the State had "concerns of the mutability and destructibility of evidence" while the phone was in police custody, prior to the data extraction. We disagree. The record shows that the State raised the issue of Johnson's attempting to have the phone remotely locked or erased in two contexts. First, the State elicited evidence on this issue in conjunction with evidence regarding the defense's examination of the phone. Specifically, after offering evidence that Johnson attempted to have the phone remotely locked or erased, the State offered evidence that, during the defense's examination of the phone, Chatten turned on the phone and neglected to put it in airplane mode, thereby leaving it vulnerable to being remotely erased. While this may indicate that the State had concerns about the phone being remotely erased *during the defense's examination of the phone*, it does not indicate that the State had concerns about the mutability and destructibility of evidence on the phone during the eight months it was in police custody before the examination. Second, the State used the evidence of Johnson's attempting to have the phone remotely

---

[6] While Johnson's phone was locked, there is no evidence that it had been remotely locked. Rather, Adams explained that, when a thumbprint has not been entered to unlock that type of iPhone for eight hours, the phone locks and requires a passcode to unlock it. Also, the phone locks and requires a passcode to unlock it when the phone has been turned off.

28

locked or erased to demonstrate his consciousness of guilt, arguing that he knew he had "some incriminating stuff" on it.

Because the record clearly shows that Johnson's phone was in police custody and remained unalterable during the eight months between the time it was seized and the search warrant was executed, the search warrant was not stale. The search of Johnson's cell phone complied with the Fourth Amendment. Point I is denied.

### C. Consent to Search

In Point II, Johnson contends the court clearly erred in denying his motion to suppress and admitting the cell phone evidence because he did not consent to the search of his cell phone. Having found that the search of Johnson's cell phone complied with the Fourth Amendment's warrant requirement, we need not determine whether Johnson consented to the search. Point II is denied as moot.

### D. Compulsion of Passcode and Fifth Amendment

In Point III, Johnson contends the circuit court clearly erred in denying his motion to suppress and admitting the evidence from his cell phone because the court's order compelling him to use his passcode to unlock the phone so the State could examine it violated his Fifth Amendment privilege against self-incrimination. Specifically, Johnson argues that entering his passcode into the phone constituted a testimonial act that was protected under the Fifth Amendment.

The Fifth Amendment protects a person from being compelled in a criminal case to be a witness against himself. U.S. Const. amend. V. While it protects

29

against compelled self-incrimination, it does not protect against the disclosure of private information.  *Fisher v. United States*, 425 U.S. 391, 401 (1976).  Hence, "the Fifth Amendment does not independently proscribe the compelled production of every sort of incriminating evidence."  *Id*. at 408.  Rather, the Fifth Amendment "applies only when the accused is compelled to make a Testimonial Communication that is incriminating."  *Id*.  "To be testimonial, a communication must either 'explicitly or implicitly . . . relate a factual assertion or disclose information.'"  *United States v. Apple MacPro Computer*, 851 F.3d 238, 247 (3rd Cir. 2017) (quoting *Doe v. United States*, 487 U.S. 201, 210 (1988)).

"[T]he act of producing evidence demanded by the government may have 'communicative aspects' that would render the Fifth Amendment applicable."  *Commonwealth v. Gelfgatt*, 11 N.E.3d 605, 613 (Mass. 2014) (quoting *Fisher*, 425 U.S. at 410).  "Whether an act of production is testimonial depends on whether the government compels the individual to disclose 'the contents of his own mind' to explicitly or implicitly communicate some statement of fact."  *Id*. (quoting *United States v. Hubbell*, 530 U.S. 27, 43 (2000)).  In other words, "the act of complying with the government's demand could constitute a testimonial communication where it is considered to be a tacit admission to the existence of the evidence demanded, the possession or control of such evidence by the individual, and the authenticity of the evidence."  *Id*. (citing *Hubbell*, 530 at 36 n.19).  Whether an act of production is a testimonial act triggering the Fifth Amendment depends on the facts and circumstances of each case.  *Id*. (citing

30

*Fisher*, 425 U.S. at 410).  For example, in *Hubbell*, the Supreme Court found that compelling the defendant to produce eleven categories of documents under a subpoena *duces tecum* required the defendant to make extensive use of the contents of his own mind in identifying and assembling the hundreds of documents responsive to the subpoena's broad requests; therefore, the act of production was testimonial for Fifth Amendment purposes.  *Hubbell*, 530 U.S. at 43.

No Missouri court has addressed whether the act of entering a passcode to unlock an electronic device seized by the government is a testimonial communication triggering Fifth Amendment protection.  In jurisdictions that have addressed this issue, the majority of cases have determined that this act of production is, in fact, a testimonial act.  *See, e.g., Apple MacPro Computer*, 851 F.3d 238 at 247; *In re Grand Jury Subpoena Duces Tecum Dated March 25, 2011*, 670 F.3d 1335, 1341 (11th Cir. 2012); *State v. Andrews*, 197 A.3d 200, 205 (N.J. Super. Ct. 2018); *Gelfgatt*, 11 N.E.3d at 614.  The rationale is that, by entering a passcode, the defendant is implicitly acknowledging that he has ownership and control over the electronic device and its content.  *Gelfgatt*, 11 N.E.3d at 614.  Essentially, the defendant's act of entering a passcode is "a communication of his knowledge about particular facts that would be relevant to the [government]'s case."  *Id*.  By producing his phone's passcode, the "defendant is making an implicit statement of fact that the iPhone passcodes are within his 'possession or control'" and is "acknowledging that he has accessed the phone before, set up password capabilities, and exercised some measure of control over

31

the phone and its contents." *Andrews*, 197 A.3d at 205 (citing *Doe*, 487 U.S. at 209).

This does not end the inquiry, however. *Gelfgatt*, 11 N.E.3d at 614. A defendant's act of production can lose its testimonial character where "the information that would be disclosed by the defendant is a 'foregone conclusion.'" *Id*. The foregone conclusion exception "provides that an act of production does not involve testimonial communication where the facts conveyed already are known to the government, such that the individual 'adds little or nothing to the sum total of the [g]overnment's information.'" *Id*. (quoting *Fisher*, 425 U.S. at 411)). For the foregone conclusion exception to apply, "the government must establish its knowledge of (1) the existence of the evidence demanded; (2) the possession or control of that evidence by the defendant; and (3) the authenticity of the evidence." *Id*. (citing *Fisher*, 425 U.S. at 410-13). Where the government satisfies the elements of the foregone conclusion exception, "'no constitutional rights are touched. The question is not of testimony but of surrender.'" *Id*. (quoting *Fisher*, 425 U.S. at 411). Under such circumstances, "the act of production does not compel a defendant to be a witness against himself." *Id*. at 615. This is true even if the device contains incriminating evidence. *Andrews*, 197 A.3d at 207. "If a compelled statement is not testimonial and for that reason not protected by the privilege, it cannot become so because it will lead to incriminating evidence." *Id*. at 207-08 (quoting *Doe*, 487 U.S. at 208-09 n.6) (internal citation and quotations omitted).

32

In this case, before the State sought the order compelling Johnson to enter his passcode to unlock the phone so the State's expert could examine it, the police observed Johnson enter his passcode into the phone and unlock it so that his expert could examine it first. The evidence in the light most favorable to the court's suppression order shows that, despite Johnson's current arguments to the contrary, he entered his passcode knowingly and voluntarily in the presence of both defense counsel and law enforcement for the purpose of having his expert examine the phone for exculpatory evidence. This action satisfied the elements of the foregone conclusion exception, because the implicit facts that were conveyed through his act of entering the passcode the second time pursuant to the order to compel -- the existence of the passcode, its possession or control by him, and the passcode's authenticity -- were already known to the State and, therefore, were a foregone conclusion. *See Andrews*, 197 A.3d at 205; *Gelfgatt*, 11 N.E.3d at 615.

Nevertheless, Johnson argues that, to satisfy the foregone conclusion exception, the State had to show that it was a foregone conclusion not only that he could unlock the phone with his passcode but also that certain files were on the phone. In support of this argument, he relies on *In re Grand Jury Subpoena*, 670 F.3d 1335. In that case, the defendant was ordered to appear before a grand jury and produce the contents of the hard drives of his laptop and five external hard drives. *Id*. at 1337. The contents of the drives were encrypted, so the subpoena required the defendant to decrypt them. *Id*. The defendant refused, asserting his Fifth Amendment privilege against self-incrimination. *Id*.

33

After finding that the decryption and production of the hard drives was a testimonial act, the Eleventh Circuit found that the foregone conclusion exception did not apply because the government did not know whether any files actually existed and were located on the hard drives. *Id*. at 1345-46. The court concluded that the foregone conclusion exception does not apply in cases where the defendant is compelled to decrypt a device unless the government can show with reasonable particularity its knowledge of the content of the files on the device. *Id*. at 1347. Examples of cases following the Eleventh Circuit's decision in *In re Grand Jury Subpoena* include *G.A.Q.L. v. State*, 257 So.3d 1058, 1063-64 (Fl. Dist. Ct. App. 2018), and *SEC v. Huang*, 2015 WL 5611644 at *3 (E.D. Pa. Sept. 23, 2015).

Other cases, however, have questioned *In re Grand Jury Subpoena*'s determination that the government "must show that it is a foregone conclusion not only that the defendant has the ability to decrypt the device(s), but also that certain files are on the device(s)." *United States v. Spencer*, 2018 WL 1964588 at *2 (N.D. Cal. April 26, 2018) (citing *In re Grand Jury Subpoena*, 670 F.3d at 1347). In *Apple MacPro Computer*, the court stated that "a very sound argument can be made that the foregone conclusion doctrine properly focuses on whether the [g]overnment already knows the testimony that is implicit in the act of production." 851 F. 3d at 248 n.7. The testimony that is implicit in the act of providing the password for the devices is only that the defendant knows the password for the devices. *Id*. Similarly, the court in *Andrews* found the

34

defendant's reliance on *In re Grand Jury Subpoena* "misplaced." 197 A.3d at 208.

In that case, the court noted that the defendant was "ordered to produce the

passcodes and the testimonial aspects of that act pertain to the ownership, control,

use, and ability to access the phones." *Id*. Because the government "has shown it

has prior knowledge of those facts," the court found that the foregone conclusion

exception applied. *Id*. Lastly, in *Spencer*, 2018 WL 1964588, the court rejected

the defendant's reliance on *In re Grand Jury Subpoena* and concluded that "the

government need only show it is a foregone conclusion that [the defendant] has

the ability to decrypt the devices." *Id*. at *3 (footnote omitted). The court further

noted that, to the extent that the defendant "contends that the government has

not adequately identified the files it seeks, that is an issue properly raised under the

Fourth Amendment, not the Fifth." *Id*.

We find the reasoning of the courts in *Apple MacPro Computer*, *Andrews*,

and *Spencer* persuasive. The focus of the foregone conclusion exception is the

extent of the State's knowledge of the existence of the facts conveyed through the

compelled act of production. Here, Johnson was ordered to produce the passcode

to his phone. The facts conveyed through his act of producing the passcode were

the existence of the passcode, his possession and control of the phone's passcode,

and the passcode's authenticity. The State showed that it had prior knowledge of

those facts because Johnson knowingly and voluntarily entered the passcode the

first time in the presence of law enforcement and defense counsel for the purpose

of having his expert examine the phone; hence, their disclosure a second time

35

pursuant to the order to compel was a foregone conclusion.[7] Therefore, the

compelled act of production was not testimonial and not protected by the Fifth

Amendment privilege against self-incrimination, and it could not become so simply

because it led to incriminating evidence. *Andrews*, 197 A.3d at 207 (citing *Doe*,

487 U.S. at 208-09 n.6). Point III is denied.

## II. Propriety of Joinder and Denial of Motion for Severance

In Point IV, Johnson contends the circuit court erred in denying his motion

for improper joinder and severance. He argues that joinder was improper because

the two first-degree sodomy charges, two first-degree rape charges, and one

charge of attempted first-degree sexual abuse involved four different victims and

were not of the same or sufficiently similar character or of a common scheme or

plan to merit joinder. Johnson further asserts that the court should have severed

the charges because evidence relating to certain counts would not have been

admissible in the trial of other counts if the counts were tried separately.

"Appellate review of claims of improper joinder and failure to sever involves

a two-step analysis." *State v. Holliday*, 231 S.W.3d 287, 292 (Mo. App. 2007).

First, we determine whether joinder was proper, which is a question of law. *State

v. Collins*, 527 S.W.3d 176, 180 (Mo. App. 2017). If joinder was not proper, then

we presume prejudice, and severance is mandatory. *Id*. If joinder was proper, then

---

[7] Indeed, Johnson's counsel conceded during oral arguments on appeal that if, after observing Johnson enter his passcode the first time for his expert's examination, law enforcement had simply entered the passcode on its own instead of seeking the order compelling Johnson to do it, the Fifth Amendment would not be implicated.

36

we "must determine whether the court abused its discretion in denying the defendant's motion to sever." *Id*. "Severance assumes that joinder is proper, but gives discretion to the trial court to decide whether trying the charges together would result in substantial prejudice." *Holliday*, 231 S.W.3d at 292.

**A. Joinder**

Liberal joinder of criminal offenses is favored for purposes of judicial economy. *State v. McKinney*, 314 S.W.3d 339, 341 (Mo. banc 2010). Two or more offenses may be charged in the same charging document "if the offenses charged . . . are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan." § 545.140.2. *See also* Rule 23.05.

The circuit court found that joinder was appropriate because the charged offenses were of the same or similar character. "The use of similar or comparable tactics is sufficient to show that the offenses are the same or similar character for purposes of joinder." *Holliday*, 231 S.W.3d at 293. "The tactics need only resemble or correspond with one another; they do not need to be identical." *Id*. "Nonexclusive factors [that show] similar tactics include commission of the same type of offenses, victims of the same sex and age group, offenses occurring at the same location, offenses closely related in time." *Id*. (alteration in original) (citation omitted).

37

Applying these factors to the facts of this case, we agree with the circuit court that the offenses were of the same or similar character. The five offenses, all sexual in nature, involved women between the ages of seventeen and twenty-one. The offenses occurred while the victims were in an impaired or drug-induced state. The offenses occurred after the defendant met the victims at bars in the same area of Columbia and brought them back to his bedroom. Lastly, the offenses occurred in a span of less than six months. While Johnson asserts that joinder was improper because "there was insignificant temporal proximity between the five alleged acts, virtually no evidentiary overlap as to these discrete events, . . . and there were four distinct alleged victims," we find that the similarity between the victims, the offenses, the tactics, and the location of the offenses, as well as the relatively short time span between the offenses, rendered joinder proper. *See State v. Conley,* 873 S.W.2d 233, 238 (Mo. banc 1994); *State v. French*, 308 S.W.3d 266, 271 (Mo. App. 2010).

**B. Severance**

Having found that joinder was proper, we next consider whether the court erred in denying Johnson's motion for severance. The circuit court has broad discretion as to severance. *McKinney*, 314 S.W.3d at 342. We will not disturb its decision unless we find an abuse of discretion, in other words, that the ruling is "clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Id*.

The court may grant a severance motion only "'upon a written motion of the defendant . . . and upon a particularized showing of substantial prejudice.'" *Collins*, 527 S.W.3d at 183 (quoting § 545.885.2). Section 545.885.2 defines "substantial prejudice" as "a bias or discrimination against the defendant . . . which is actually existing or real and not one which is merely imaginary, illusionary or nominal." In determining prejudice, "'[t]he court should consider, among other relevant factors, the number of offenses charged, the complexity of the evidence offered, and whether the trier of fact will be able to distinguish the evidence and apply the law intelligently as to each offense.'" *Conley*, 873 S.W.2d at 238 (quoting *State v. McCrary*, 621 S.W.2d 266, 272 (Mo. banc 1981)).

In his written motion, Johnson argued that joinder would result in substantial prejudice because of the court's prior ruling that "at least some propensity evidence is admissible at trial for the charge relating to M.V. under Missouri Constitution Article I, Section 18(c). All of the other alleged victims are over 18 years old, so propensity evidence would not be admissible regarding those allegations if the counts were tried separately." Additionally, Johnson argued that joinder would cause him substantial prejudice because the court had "previously ruled that propensity evidence regarding K.B. was not admissible at trial. The addition of Count II for attempted sexual abuse of K.B. by removing her clothes is an effort to contravene the [c]ourt's ruling."

39

These allegations were insufficient to demonstrate substantial prejudice.[8] "Severance of jointly charged offenses is not mandated merely because evidence relating to one count would not be admissible in the trial of a second count if the two were tried separately." *Conley*, 873 S.W.2d at 238. While it is a "relevant factor" in determining prejudice, "even where the evidence would not be admissible if the charges were tried separately, any prejudice may be overcome where the evidence with regard to each crime is sufficiently simple and distinct to mitigate the risks of joinder." *Id*.

Here, Johnson was charged with five offenses: two first-degree sodomies, two first-degree rapes, and one count of attempted first-degree sexual abuse. The offenses occurred on four separate days and involved four separate victims. Each charge had its own set of witnesses, and some of the charges involved testimony from only one or two witnesses. Moreover, the jury was instructed that "[t]he defendant is charged with a separate offense in each of the five (5) counts submitted to you. Each count must be considered separately." The instruction also provided, "You should return a separate verdict for each count and you can return only one verdict for each count." Additionally, the jury was given separate verdict-directing instructions and verdict forms for each count. "Where the

---

[8] In his brief, Johnson also alleges that he was substantially prejudiced because the joinder of the offenses constrained the circuit court to impose consecutive, rather than concurrent, sentences on four of the counts. We decline to consider the merits of this allegation, as Johnson did not include this allegation in his required written motion for severance and is attempting to enlarge his particularized showing of substantial prejudice beyond what he presented to the court below. Because the circuit court never had the opportunity to address this allegation of prejudice, we cannot say that the court abused its discretion in denying Johnson's motion to sever on this basis.

40

evidence relating to each of the offenses is uncomplicated and distinct, and the jury is properly instructed to return separate verdicts for each offense charged, the trial court does not abuse its discretion in refusing to sever the counts." *Collins*, 527 S.W.3d at 184-85 (quoting *State v. Love*, 293 S.W.3d 471, 477 (Mo. App. 2009)). Point IV is denied.

**III. Sufficiency of Evidence to Support Attempted Sexual Abuse Conviction**

In Point V, Johnson contends the evidence was insufficient to support his conviction for attempted first-degree sexual abuse of K.B. Our review of a challenge to the sufficiency of the evidence to support a conviction is "limited to determining whether there was sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt." *State v. Naylor*, 510 S.W.3d 855, 859 (Mo. banc 2017) (internal citation and quotations omitted). "This is not an assessment of whether this [c]ourt believes that the evidence at trial established guilt beyond a reasonable doubt but rather a question of whether, in light of the evidence most favorable to the State, any rational fact-finder could have found the essential elements of the crime beyond a reasonable doubt." *Id*. (internal citations and quotations omitted). We do not reweigh the evidence but, instead, accept as true all evidence and inferences supporting guilt and ignore all contrary evidence and inferences. *Id*. at 858-59.

A person commits the crime of first-degree sexual abuse if he "subjects another person to sexual contact when that person is incapacitated, incapable of consent, or lacks the capacity to consent, or by the use of forcible compulsion." §

41

566.100.1.  "Sexual contact" means "any touching of another person with the genitals or any touching of the genitals or anus of another person, or the breast of a female person, or such touching through the clothing, for the purpose of arousing or gratifying sexual desire of any person."  § 566.010(3).

"A person is guilty of attempt to commit an offense when, with the purpose of committing the offense, he does any act which is a substantial step towards the commission of the offense."  § 564.011.1.  "A **'substantial step'** is conduct which is strongly corroborative of the firmness of the actor's purpose to complete the commission of the offense."  *Id*.  To be "strongly corroborative," "an action must logically support the firmness of the actor's criminal purpose in question."  *State v. Rollins*, 321 S.W.3d 353, 360 (Mo. App. 2010).  "Whether an act constitutes a substantial step depends on the facts of the particular case."  *State v. Cunningham*, 547 S.W.3d 795, 798 (Mo. App. 2018).

In the light most favorable to the verdict, the evidence showed that Johnson gave K.B. a substance that she believed was cocaine.  Johnson, who admitted to being "very knowledgeable" about the different forms of hallucinogenic mushrooms and their effects, admitted that he had actually given K.B. a mixture of cocaine and a substance associated with hallucinogenic mushrooms that was not for human consumption.  After K.B. began showing the effects of the drugs by crying, screaming, and crawling down the hallway, Johnson took her into his apartment.

Johnson did not open the door when J.L., who explained who he was and said that he was looking for K.B., knocked on Johnson's door for ten to fifteen

42

minutes. When the police then knocked on Johnson's door looking for K.B., they had to knock for "a very long time" before Johnson finally answered the door. After Johnson allowed the police inside, they found K.B. inside Johnson's bedroom, which he had locked from the outside. She was not responsive and appeared heavily intoxicated. A jar of Vaseline was on the table next to the bed. K.B.'s clothes, including her underwear, had been removed and piled in a corner. K.B. was dressed in clothes that were not hers and that appeared to have been hastily put on her. Although Johnson told one of the officers that he had removed K.B.'s clothes for her because she had vomited "everywhere" on them, the officer did not see *any* vomit on her clothes. Moreover, at trial, Johnson gave a different explanation for removing K.B.'s clothes, as he testified that he had "helped" her take off her clothes because she had urinated on herself.

From this evidence, the jury could reasonably infer that Johnson had removed K.B.'s clothes for the purpose of engaging in sexual contact with her and that he would have committed the act had the police not intervened. *See State v. Reese*, 436 S.W.3d 738, 742 (Mo. App. 2014) (noting that "[w]e may consider law enforcement intervention when determining intent"). There was sufficient evidence from which a rational juror could have found Johnson guilty beyond a reasonable doubt of attempted first-degree sexual assault. Point V is denied.

43

**CONCLUSION**

The judgment is affirmed.

_____
LISA WHITE HARDWICK, JUDGE

ALL CONCUR.