

# In the
# Missouri Court of Appeals
# Western District

**JOANTHONY D. JOHNSON,**
                  **Appellant,**

                                    **WD85067**
                              **OPINION FILED:**
                                **April 4, 2023**

**v.**

**STATE OF MISSOURI,**
                    **Respondent.**

**Appeal from the Circuit Court of Boone County, Missouri**
The Honorable Jeff Harris, Judge

Before Division Four:  Gary D. Witt, Chief Judge, Presiding, Alok Ahuja, Judge and
Christopher K. Limbaugh, Special Judge

Joanthony Johnson ("Johnson") appeals the judgment of the Circuit Court of Boone

County, Missouri ("motion court"), following an evidentiary hearing, denying Johnson's

amended motion to vacate, set aside, or correct the judgment and sentence, pursuant to

Rule 29.15.[1]  On appeal, Johnson argues the motion court erred in denying his amended

---

[1] All rule references are to Missouri Court Rules (2021), unless otherwise indicated.

motion because Johnson's trial counsel ("trial counsel") was ineffective in (1) hastily arranging and proceeding with the October 28, 2016, cell phone extraction agreement; (2) making the cell phone extraction agreement without Johnson's knowing and voluntary consent; (3) failing to intervene when the State's investigator watched as Johnson entered the passcode on his phone during the October 28, 2016 extraction; (4) limiting her suppression motion to the validity of the search warrant and the court's order compelling Johnson to enter his passcode a second time, thereby failing to preserve the issue of the execution of the search warrant; and (5) failing to argue in her motion for improper joinder and severance that joinder prejudiced Johnson because it made him ineligible for concurrent sentences. Finding no error, we affirm the judgment of the motion court.

## Factual Background

The facts of this case, viewed in the light most favorable to the verdict, were thoroughly recounted by this Court on direct appeal in *State v. Johnson*, 576 S.W.3d 205, 212-16 (Mo. App. W.D. 2019):

> On the night of August 21, 2015, C.N., a college student, went with her roommates to The FieldHouse bar in Columbia. C.N. got separated from her friends. The next memory she had was of smoking "dabs," which are a condensed form of THC more potent than leaf marijuana, in the kitchen of Johnson's apartment. C.N. remembered feeling sick to her stomach afterwards and holding onto the toilet in Johnson's bathroom. Her head was spinning, and she thought she was going to vomit. Johnson came into the bathroom, grabbed C.N.'s arm, told her she was fine, and tried to get her out of the bathroom. She repeatedly told him that she did not feel well and wanted to be left alone, but he continued to grab her. Johnson took C.N. into the bedroom. C.N.'s next memory was of waking up, face down, on the bed the next morning. Johnson was behind her, and she was unsure of what was happening. After this, C.N. occasionally saw Johnson out at The FieldHouse and Roxy's, another Columbia bar. She did not confront Johnson or report

2

the incident to police because she was unsure whether Johnson had done anything to her that night.

A few weeks later, on September 13, 2015, K.B., then nineteen years old, went to Willie's bar in Columbia with her friends, S.C. and J.L. K.B. and S.C. met Johnson while sitting at the bar, and they drank shots with him. They decided to accompany Johnson and his friend back to Johnson's apartment so they could buy some Xanax and continue drinking. At the apartment, Johnson offered K.B. and S.C. cocaine. After the two women each snorted a line, they went to the bathroom together and questioned whether the substance Johnson had given them was actually cocaine.

Johnson, K.B., and S.C. went to another apartment to buy the Xanax. On the way to the apartment, S.C. started experiencing "really weird visuals." S.C. saw a rainbow grid, her vision became blurry, and she felt groggy. After buying the Xanax, Johnson gave K.B. and S.C. each a pill. K.B. took her pill, but S.C. did not take hers. The three went back to Johnson's apartment, where S.C. retrieved K.B.'s shoes and purse. When K.B. and S.C. announced their intention to leave at that time, Johnson insisted on accompanying them to the entrance of the apartment building. As they walked down the hallway, K.B. started "freaking out." She began crying, screaming, and crawling back down the hallway toward Johnson's apartment. Johnson took K.B. into his apartment, while S.C. went downstairs to try to find their friend J.L., who was attempting to call her.

By the time S.C. arrived in the lobby of Johnson's apartment building, her memory was getting fuzzy, and she felt like she was losing control of her muscles. She tried to go back upstairs to Johnson's apartment to find K.B., but she could not find the door to the stairwell. S.C. began rehearsing facts like her name and birthday and K.B.'s name and birthday. Finally, S.C. decided to sit in the lobby, where a couple found her. She gave her phone to the couple and asked them to call J.L. and direct him to the building. The couple did so and also called the police.

When J.L. arrived, he went upstairs and began knocking on apartment doors before he was eventually directed to Johnson's apartment. J.L. knocked loudly and "assertively" on Johnson's door for ten to fifteen minutes. Johnson did not answer the door, even though J.L. could hear music or a television inside the apartment. J.L. explained who he was and said that he was looking for his friend, K.B. Johnson still did not answer the door. J.L. went downstairs and gave the police Johnson's apartment number. When the police went to Johnson's apartment, the police had to knock on his door for "a very long time" before Johnson finally came to the door.

3

When the police entered the apartment, Johnson unlocked the door to his bedroom. K.B. was lying on Johnson's bed. Because K.B. did not respond to the officers and appeared "heavily intoxicated" and "high on something," they called for an ambulance. K.B. was wearing camo pants and a baggy white T-shirt. The T-shirt was not on her properly, as only one arm was through a sleeve. The other arm was draped over the shirt, which caused K.B.'s armpit and the underside of her breast to be exposed when she tried to sit up. K.B.'s clothes were piled in a corner and appeared to have been peeled off of her, because her underwear was still inside of her pants. Johnson told the officer that he had removed K.B.'s clothes because she had vomited "everywhere" on them, but the officer did not see any vomit on her clothes. The officers found a jar of Vaseline on the table next to the bed.

The officers recovered a baggie from Johnson's living room that was labeled "4-ACO-DMT fumarate," which is a substance associated with hallucinogenic mushrooms. The baggie was also marked, "Not for human consumption." Residue from white powder was nearby and appeared to have been lined up with a credit card. The officers collected the powder, but the powder blew away when it was taken outside for testing. Due to an officer's mistakenly coding his report of the incident as a non-criminal matter, the police did not follow up or investigate the incident as a criminal matter.

A couple of months later, on November 19, 2015, T.T., then twenty-one years old, went to Roxy's bar and saw Johnson there. T.T. had first met Johnson in late 2014 or early 2015. When T.T. encountered Johnson again at Roxy's on the evening of November 19, 2015, Johnson went to the bar multiple times and bought a shot and mixed drinks for her. T.T. was not with Johnson when he got the drinks and could not see if he put anything in them. Johnson invited T.T. and her friends to a party at his place after the bar closed. After having three drinks, T.T. went outside the bar to smoke a cigarette. T.T.'s next memory was tripping while walking with Johnson near a parking garage. Johnson held on to T.T. and told her, "Come on." The next thing T.T. remembered was waking up at around 6:30 or 7:00 a.m. in Johnson's bed. She was lying on her stomach and wearing nothing but her bra and underwear. T.T. had no memory of taking off her clothes. T.T. asked Johnson if there had been a party, and he said no one but her had come to the apartment. T.T. felt "very weird, weird and groggy," but she did not feel hungover. Although she had consumed alcohol in the past, she had never before blacked out from drinking. Her body was sore, and her neck felt as though someone had choked her. T.T. found a bruise on the back of her thigh that looked like the imprint of three fingers. T.T. did not report the incident to the police because she was not sure what had happened.

4

Two and a half months later, in the early morning hours of February 4, 2016, M.V., then seventeen years old, met Johnson outside of The FieldHouse. M.V. and her friend, H.J., had been drinking at the bar using fake IDs. M.V. had also snorted cocaine while inside the bar. Outside the bar, Johnson offered to provide M.V. and H.J. some dabs at his apartment. They agreed to go and went with him and two other women to Johnson's apartment.

Once inside the apartment, M.V. and H.J. smoked the dabs that Johnson gave them. Johnson also mixed drinks for M.V. The two other women eventually left, and M.V. and H.J. fell asleep on Johnson's couch. M.V. got up during the night and tried to find something to eat. She ate three chocolate peanut butter balls from a bag that she found in Johnson's refrigerator. M.V.'s next memory was of waking up and feeling hazy. She thought someone had spiked her drink, and she tried to get H.J. to wake up but was unsuccessful. M.V. passed out again. When she woke up, she felt lethargic and totally out of it.

At that point, Johnson came out of his bedroom. M.V. told him that she wanted to go to the doctor. She repeatedly told him that someone had put something in her drink. Johnson told her that she was fine, grabbed her by her waist, and walked her into his bedroom. M.V. knew that Johnson was going to take advantage of her because she was not in control of her body.

Johnson laid M.V. down on his bed and removed her spandex shorts. He then climbed on top of her and had vaginal intercourse with her. M.V. had no ability to resist him because she felt so weak and could not do anything other than make unhappy grunting noises. Johnson appeared to be turned on by those noises and went faster. According to M.V., the effects that she was feeling were worse than she had experienced when she had taken acid on prior occasions. She seized, twitched, and hit herself, and she also kept passing out and regaining consciousness. M.V. passed out after Johnson had finished raping her the first time. When she woke up, Johnson grabbed her, put her face down on the bed, and had intercourse with her again. This time, M.V. was able to tell him to stop and was crying. Johnson seemed to enjoy her crying and went faster. M.V. continued to seize, twitch, and pass in and out of consciousness.

M.V. and H.J. left Johnson's apartment sometime after 7:00 a.m. M.V. told H.J. that she thought Johnson had raped her. As H.J. drove her home, M.V. felt lethargic and was still seizing, twitching, and hitting herself. H.J. called M.V.'s father and told him that someone had raped M.V. M.V.'s father took her to the hospital as soon as she got home. At the hospital, M.V. was

disoriented, had trouble concentrating during the examination, and frequently lost her train of thought mid-sentence. She was groggy and swaying back and forth, her speech was slurred, and she fell asleep in the middle of a conversation with a sheriff's deputy.

Johnson's DNA was found in semen recovered from M.V.'s cervix and anus. Testing of M.V.'s blood showed the presence of alcohol, THC, cocaine, and Psilocin, which is a substance commonly found in hallucinogenic mushrooms.

The court issued a search warrant for Johnson's apartment on February 19, 2016. The warrant was executed on February 22, 2016, and an iPhone was then seized from the apartment. The iPhone could not be searched at that time because it was locked.

Meanwhile, the State charged Johnson with one count of first-degree rape for knowingly having sexual intercourse with M.V., a person who was incapable of consent. The State also charged him with two counts of felony possession of a controlled substance, specifically, more than five grams of marijuana and hallucinogenic candies or dabs, with the intent to distribute.

While the charges against Johnson for the incident involving M.V. were pending, the police were able to search Johnson's iPhone on October 28, 2016. On Johnson's phone, the police found three videos showing him having anal intercourse with C.N. and two videos showing Johnson having oral sex and vaginal intercourse with T.T. Neither C.N. nor T.T. made any sounds during the videotaped sexual encounters. The police showed C.N. and T.T. the videos, and the two women said that they did not consent to any sexual contact with Johnson on those occasions. Johnson's phone also contained texts that Johnson sent to friends during and after the incident with M.V. and H.J. In one of those texts, which Johnson sent when he first arrived at his apartment with M.V. and H.J., Johnson stated that he was "about to finally get some pussy." In another text that Johnson sent a few hours after M.V. left his apartment, Johnson said the he "[m]ade a porno." Additionally, Johnson's phone contained a brief video of M.V. and H.J. sleeping in his apartment.

The State subsequently filed a five-count amended indictment against Johnson. Count I alleged that Johnson committed first-degree sodomy on August 22, 2015, by knowingly having deviate sexual intercourse with C.N. Count II alleged that Johnson committed attempted first-degree sexual abuse on September 14, 2015, by removing K.B.'s clothing, which was a substantial step toward the commission of the crime of first-degree sexual abuse and was

6

done for the purpose of committing such abuse. Count III alleged that Johnson committed first-degree sodomy on November 20, 2015, by knowingly having sexual intercourse with T.T. Count IV alleged that Johnson committed first-degree rape on November 20, 2015, by knowingly having sexual intercourse with T.T. Lastly, Count V alleged that Johnson committed first-degree rape on February 4, 2016, by knowingly having sexual intercourse with M.V. Counts I, III, IV, and V alleged that the victims were incapable of consent because they were in a drug-induced state and were known by Johnson to be unable to make a reasonable judgment as to the nature or harmfulness of the sexual acts.

Trial was held in April 2017. Johnson testified in his defense that C.N., T.T., and M.V. were conscious during the sexual acts and that all of the sexual encounters were consensual. Johnson admitted that, in addition to videotaping himself having sex with C.N. and T.T., he videotaped himself having sex with M.V. He did not save the video of M.V. to his phone, however, but instead sent it to a friend via Snapchat. Johnson admitted that none of the women were aware he was videotaping them. Johnson denied attempting to sexually abuse K.B. He first testified on direct examination that he helped K.B. take off her clothes and put on his clothes because she had urinated on herself. On cross-examination, however, he acknowledged that he told the police that he had taken off K.B.'s clothing by himself because she had vomited on them. Johnson also testified that he was "very knowledgeable" about the different forms of hallucinogenic mushrooms and their effects. He admitted that he had mixed cocaine with the 4-ACO-DMT fumarate in the plastic bag that police found in his apartment on the night of the incident with K.B.

The jury found Johnson guilty on all charges. The court sentenced him as a persistent misdemeanor offender to four years in prison for attempted sexual abuse and twenty-five years in prison for each of the two rape and two sodomy counts. The sentences on the rape and sodomy counts were ordered to run consecutively to each other and concurrently to the attempted sexual abuse sentence, for a total of 100 years.

This Court affirmed the judgment of conviction and sentence. *Johnson*, 576 S.W.3d at 231. Johnson filed a timely motion to vacate, set aside, or correct the judgment and sentence, pursuant to Rule 29.15, and appointed counsel timely filed an amended motion. The motion court held an evidentiary hearing, at which Johnson, trial counsel, and

7

Johnson's appellate counsel ("appellate counsel") testified. The motion court denied Johnson's amended motion. This appeal follows.

## Standard of Review

Appellate review of the motion court's judgment under Rule 29.15 is limited to a determination of whether the findings of fact and conclusions of law are clearly erroneous. *Price v. State*, 422 S.W.3d 292, 294 (Mo. banc 2014); Rule 29.15(k). "Findings and conclusions are clearly erroneous only if a full review of the record definitely and firmly reveals that a mistake has been made." *King v. State*, 638 S.W.3d 113, 117 (Mo. App. W.D. 20022) (quoting *Morrow v. State*, 21 S.W.3d 819, 822 (Mo. banc 2000)). "It is incumbent upon the movant in a post-conviction motion to prove his claims for relief by a preponderance of the evidence." *Dishmon v. State*, 248 S.W.3d 656, 660 (Mo. App. S.D. 2008). We defer to the motion court's greater ability to judge the credibility of witnesses. *Moore v. State*, 407 S.W.3d 172, 175 (Mo. App. E.D. 2013).

## Analysis

"To be entitled to post-conviction relief for ineffective assistance of counsel, the movant must satisfy the two-pronged *Strickland* test." *Jindra v. State*, 580 S.W.3d 635, 641 (Mo. App. W.D. 2019); *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "First, the movant must show counsel failed to perform to the degree of skill, care, and diligence that a reasonably competent attorney would under similar circumstances." *Lindsey v. State*, 633 S.W.3d 547, 551 (Mo. App. W.D. 2021). This requires that the movant show that counsel's representation "fell below an objective standard of reasonableness." *Jindra*, 580 S.W.3d at 641; *Strickland*, 466 U.S. at 688. The

8

movant must then also establish that he was prejudiced by this failure. *Jindra*, 580 S.W.3d at 641. "Prejudice occurs when 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* (quoting *Johnson v. State*, 406 S.W.3d 892, 899 (Mo. banc 2013)). "A movant must overcome the strong presumption that counsel's conduct was reasonable and effective." *Id.* "To overcome this presumption, a movant must identify specific acts or omissions of counsel that, in light of all the circumstances, fell outside the wide range of professional competent assistance." *Id.* (internal quotations omitted). "If a movant fails to satisfy the performance prong, there is no need to address the prejudice prong." *Scroggs v. State*, 655 S.W.3d 210, 216 (Mo. App. W.D. 2022).

### Points I & II: Cell phone extraction agreement

Johnson argues the trial court erred in denying his amended motion because trial counsel failed to act as a reasonably competent attorney by hastily arranging and proceeding with the October 28, 2016, cell phone extraction agreement, and Johnson was prejudiced because the State's discovery of additional criminal activity on the cell phone led to further charges. In his second point on appeal, Johnson argues the cell phone extraction agreement was made without his knowing and voluntary consent. For ease of analysis, we discuss these points together.

Johnson was originally charged with one count of rape in the first degree, section 566.030,[2] for the offense against M.V., and two counts of possession of a controlled

---

[2] All statutory references are to Revised Statutes of Missouri (2000), as updated by supplement at the time of the offenses, unless otherwise indicated.

substance with intent to distribute, section 195.211. Johnson's cell phone was seized pursuant to a search warrant on February 19, 2016, but the police were unable to open it because it was locked. On March 28, 2016, Johnson filed a "Motion to Preserve Electronic Evidence and To Allow Defense Expert to Examine Cell Phone Before State Examination." In Johnson's motion, he argued that Johnson's "telephone might contain exculpatory information," and "[i]f a minimally trained person attempts to extract data from the cell phone, any exculpatory evidence could be destroyed." Therefore, Johnson sought an order prohibiting the State from extracting any data from the phone "until [Johnson] has an opportunity to extract and examine the data on the phone." The trial court held a hearing on Johnson's motion on April 4, 2016, at which Johnson was present. The trial court granted Johnson's motion to examine the cell phone, and trial counsel stated on the record, "So the only other prong of that request was that we do the first extraction, not the state."

The issue of data extraction from Johnson's cell phone remained unaddressed until October 2016. At that time, trial counsel and the State agreed to have their respective experts extract data from the cell phone in St. Louis. The extraction in St. Louis did not occur, however, because the parties were concerned that attempting to extract data from the cell phone without unlocking the phone with the correct passcode could potentially erase all of the data from the phone. Therefore, trial counsel and the State entered into an agreement to perform the cell phone extraction on October 28, 2016, at the Boone County Jail, where Johnson was being detained pre-trial, so that Johnson could enter his passcode to unlock the phone for the defense's and the State's experts to extract data from the phone. Johnson entered his passcode for the defense's expert, who then performed the data

10

extraction. When it came time for the State to perform the data extraction from the cell phone, the phone had locked itself, and Johnson refused to re-enter his passcode. The parties called the trial court to explain the situation, and the State orally moved to compel Johnson to enter his passcode for the State's expert to extract the data. At this telephone conference with the trial court, trial counsel argued that the agreement between trial counsel and the State to have both experts extract data from the cell phone was silent regarding what would happen if the phone locked after the defense expert's extraction. However, because trial counsel agreed to allow the State's expert to perform a data extraction, the mechanics of whether Johnson would have to enter his passcode once or twice were irrelevant to the underlying agreement that both parties could examine the contents of the phone. The trial court granted the State's motion to compel, and Johnson re-entered his passcode for the State's expert, who then performed the data extraction. The State found additional incriminating evidence on the cell phone, including videos of Johnson raping other victims, which led to an amended five-count indictment.

The "Sixth Amendment imposes on counsel a duty to investigate, because reasonably effective assistance must be based on professional decisions and informed legal choices can be made only after investigation of options." *Strickland*, 466 U.S. at 680. "A trial strategy decision may only serve as a basis for ineffective counsel if the decision is unreasonable." *McLaughlin v. State*, 378 S.W.3d 328, 337 (Mo. banc 2012). "[I]t is not unreasonable for trial counsel to rely on statements of the defendant in determining what defenses to pursue at trial such that his or her failure to investigate the truthfulness of the statements will not give rise to a claim of ineffective assistance of counsel for failure to

11

investigate." *Anderson v. State*, 66 S.W.3d 770, 777 (Mo. App. W.D. 2002). "Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant." *Strickland*, 466 U.S. at 691. Further, trial counsel is not ineffective simply because she accedes to her client's wishes. *Guinan v. State*, 769 S.W.2d 427, 429 (Mo. banc 1989).

Here, trial counsel was not ineffective in arranging the cell phone extraction agreement. After the phone had been seized by law enforcement, the defense initiated a process, at defendant's request, to obtain information from the cell phone, which defendant indicated would be exculpatory. At the evidentiary hearing, trial counsel testified that Johnson believed the cell phone contained videos of him having consensual sex with M.V. Therefore, trial counsel began negotiations with the State to examine the cell phone and obtain the potentially exculpatory evidence. Trial counsel testified that Johnson also knew that the cell phone contained other videos of him have sexual contact with other women. Because the State possessed the cell phone pursuant to the search warrant, trial counsel's agreement with the State to have both experts extract data from the cell phone was the only strategic avenue available for the defense to obtain the supposedly exculpatory videos. Trial counsel relied on Johnson's statements that all of the sexual videos on the cell phone were consensual in making her decision to pursue the extraction agreement. The fact that the cell phone revealed additional videos of Johnson raping other incoherent or unconscious victims cannot be blamed on trial counsel.

Further, the motion court correctly found that the cell phone extraction agreement was not made hastily. Trial counsel filed a motion to preserve the electronic data on the

12

cell phone in April 2016, and the cell phone's data was not extracted until October 2016. Trial counsel testified that the agreement was the result of negotiations with the State, and the original extraction date was postponed to ensure the data on the cell phone would not be destroyed. Trial counsel and the State agreed to conduct the extraction in Johnson's presence to ensure the correct passcode was entered, so as to protect the data on the phone. Trial counsel proceeded with the extraction agreement in a sincere effort to build a defense for Johnson based on his statements that the cell phone contained exculpatory evidence of consensual sexual contact with the victim. This was reasonable trial strategy, and trial counsel was not ineffective in proceeding with the extraction agreement.

In Johnson's second point on appeal, he argues that trial counsel made the cell phone extraction agreement without Johnson's knowing and voluntary consent. The record reflects that this allegation is unsupported and untrue on its face. Johnson was present at the hearing in April 2016 regarding the "Motion to Preserve Electronic Evidence and To Allow Defense Expert to Examine Cell Phone Before State Examination." During the negotiations with the State regarding the extraction agreement, trial counsel had regular contact with Johnson to keep him informed. Before the actual extraction took place at the Boone County Jail, trial counsel visited with Johnson to explain the extraction. Trial counsel explained to Johnson that the defense expert would perform the extraction first, and then the State's expert would perform the extraction. At the evidentiary hearing, trial counsel stated that it was not possible that Johnson did not understand that the State would examine the contents of the cell phone. Trial counsel testified that Johnson understood the agreement, and when asked if it was possible that there was a miscommunication between

13

trial counsel and Johnson regarding the requirement that he enter the passcode for the State's expert, trial counsel responded "No." The motion court found trial counsel's testimony credible in this regard. Therefore, the extraction agreement was made with Johnson's knowing and voluntary consent.

Points I and II are denied.

### *Point III: Observation of passcode*

In Johnson's third point on appeal, he argues the motion court erred in denying his amended motion because trial counsel was ineffective in preventing law enforcement from observing Johnson enter his passcode into the phone during the cell phone extraction. During the cell phone extraction on October 28, 2016, as Johnson entered his passcode in order for the defense's expert to conduct the data extraction, the State's expert saw the passcode and wrote it down. Trial counsel testified that she believed she messed up in failing to block the State's expert's view of Johnson entering the passcode. On direct appeal, Johnson argued that the trial court erred in denying his motion to suppress the contents of the cell phone because his compelled entry of the passcode for the State's expert was a testimonial act that violated his Fifth Amendment rights. We affirmed the trial court's judgment with respect to the motion to suppress based on the foregone conclusion doctrine. *Johnson*, 576 S.W.3d at 228. Johnson now argues trial counsel was ineffective in permitting the State's expert to watch him enter his passcode for the defense's expert, and he was prejudiced because this allowed the State to argue the foregone conclusion doctrine in its response to Johnson's motion to suppress and on direct appeal.

14

Johnson's claim lacks merit for several reasons. First, although trial counsel testified that she believed she messed up in failing to block the State's expert's view of Johnson entering the passcode, she was under no obligation to block the passcode because it is clear from the record that Johnson had already agreed to allow the State's expert to conduct an extraction of the data from the cellphone. Trial counsel testified that she did not anticipate that the phone would relock after the defense expert conducted the extraction, so there was no reason for her to block the passcode at the time of the defense's data extraction. Further, the trial court compelled Johnson to reenter the passcode for the State's expert in order to enforce the terms of the agreement, not because the State's expert had witnessed the passcode. And the trial court denied Johnson's motion to suppress on multiple grounds, including Johnson's preexisting agreement with the State to allow them access to the data from the phone, not solely based on the foregone conclusion doctrine.

Moreover, Johnson's interpretation of the foregone conclusion doctrine as discussed in this Court's opinion on direct appeal misunderstands the Court's holding. Johnson argues that because the State's expert saw the passcode, the Court employed the foregone conclusion doctrine to justify the compelled entry of the passcode for the State's expert. This is incorrect. In order for the foregone conclusion doctrine to apply, "the government must establish its knowledge of (1) the existence of the evidence demanded; (2) the possession or control of that evidence by the defendant; and (3) the authenticity of the evidence." *Johnson*, 576 S.W.3d at 226. In *Johnson*, we held that because Johnson entered his passcode knowingly and voluntarily in the presence of both trial counsel and law enforcement for the purpose of having his expert examine the phone for exculpatory

15

evidence, he satisfied the elements of the foregone conclusion doctrine because "the implicit facts that were conveyed through his act of entering the passcode the second time pursuant to the order to compel -- the existence of the passcode, its possession or control by him, and the passcode's authenticity -- were already known to the State and, therefore, were a foregone conclusion." *Id.* The Court's analysis did not rely upon the fact that law enforcement knew the exact passcode, only that law enforcement was aware of the passcode's existence and authenticity because Johnson had already entered it correctly for the defense's expert. Whether trial counsel shielded law enforcement from seeing the exact passcode is irrelevant; therefore, Johnson was not prejudiced.

Point III is denied.

### *Point IV: Motion to suppress*

Johnson argues the motion court clearly erred in denying his amended motion because trial counsel limited her suppression motion to the validity of the search warrant and the trial court's order compelling Johnson to enter his passcode for the State's expert and failed to argue that the execution of the search violated Johnson's rights against unlawful search and seizure. Johnson argues that he was prejudiced because had trial counsel preserved this argument, Johnson could have raised it on direct appeal.

Generally, the failure to preserve an issue for appeal "is not a cognizable ground for relief for ineffective assistance of counsel on a post-conviction motion." *McLaughlin*, 378 S.W.3d at 354. "To state a cognizable claim for ineffectiveness for failure to . . . preserve an issue on appeal, [Johnson] must allege that the trial counsel's failure denied him a fair

16

trial." *Id.* at 355. Further, trial counsel will not be deemed ineffective for failing to file a meritless motion to suppress. *Coon v. State*, 504 S.W.3d 888, 892 (Mo. App. W.D. 2016).

Here, Johnson fails to raise a cognizable claim for post-conviction relief because he does not allege that trial counsel's failure to move to suppress the execution of the search warrant denied him a fair trial. Rather, Johnson argues that trial counsel's failure to raise this issue denied appellate counsel the opportunity to argue the execution of the search warrant on direct appeal. Further, even if a cognizable claim existed, Johnson was not prejudiced because the argument that the execution of the search warrant violated his Fourth Amendment rights is meritless. As the motion court correctly noted, the search of the phone's content did not occur because of the search warrant. Rather, as explained above, Johnson knowingly and voluntarily consented to the search of the data on his phone through the extraction agreement that trial counsel made with the State.

Even if the search of the cell phone occurred pursuant to the search warrant, the discovery of additional rape victims would not have violated Johnson's Fourth Amendment rights. As we explained in *Johnson*:

> The warrant in this case constrained the search of Johnson's phone to evidence of the specific crimes of distribution, deliver, and manufacture of a controlled substance and first-degree rape. The affidavit that was incorporated into the warrant described in detail the offenses that Johnson was suspected of committing and how cell phones could be used in the commission of those offenses. At the time the cell phone was seized, the officers could not have known where such evidence was located in the phone or in what format, such as texts, videos, photos, emails, or applications.

*Johnson*, 576 S.W.3d at 223. Therefore, in holding that the scope of the warrant was sufficiently particular and not overbroad, this Court made clear that had the search of the

17

phone occurred pursuant to the search warrant, it would not have exceeded the scope of the warrant because, "by necessity government efforts to locate particular files will require examining many other files to exclude the possibility that the sought after data are concealed there." *Id.* Accordingly, Johnson was not prejudiced by trial counsel's failure to move to suppress the execution of the search warrant.

Point IV is denied.

### *Point V: Motion for improper joinder and severance*

In Johnson's fifth point on appeal, he argues the motion court erred in denying his amended motion because trial counsel was ineffective in failing to argue, in her motion for improper joinder and severance, that joinder substantially prejudiced Johnson because it made him ineligible for concurrent sentences. Johnson argues he was prejudiced by this failure because there is a reasonable probability that the overall sentence would have been less than 100 years, and there is a reasonable probability that severance would have been granted.

After the State filed an amended five-count indictment, trial counsel filed a motion for improper joinder and severance, which argued that each count should be tried separately. Trial counsel argued that severance should be granted because joinder of the counts would result in substantial prejudice to Johnson because it would require the admission of propensity evidence regarding each rape victim. The trial court denied the motion for improper joinder and severance, finding that Johnson failed to make a particularized showing of substantial prejudice if the counts were not severed. Johnson now argues that trial counsel failed to argue that joinder would result in substantial

prejudice because the trial court was required to sentence Johnson to consecutive terms of imprisonment following a guilty verdict, pursuant to section 558.026.1 (2013 Supp.).

There is no constitutional right to be tried for one offense at a time. *State v. Holliday*, 231 S.W.3d 287, 293 (Mo. App. W.D. 2007). Joinder of offenses is proper where the charged offenses are part of the same act or transaction, or part of a common scheme or plan, or are of the same or similar character. *Id.*; section 545.140.2; Rule 23.05. "If it appears that a defendant or the state is substantially prejudiced by a joinder of the offenses for trial, upon a written motion of the defendant or the state and upon a particularized showing of substantial prejudice, the court may grant a severance of offenses or provide whatever relief justice requires." Section 545.885.2. "Substantial prejudice" means "a bias or discrimination against the defendant or the state which is actually existing or real and not one which is merely imaginary, illusionary or nominal." *Id.*

At the time of the offenses, section 558.026.1 (2013 Supp.) provided:

> Multiple sentences of imprisonment shall run concurrently unless the court specifies that they shall run consecutively; except in the case of multiple sentences of imprisonment imposed for any offense committed during or at the same time as, or multiple offenses of, the following felonies:
>
> (1) Rape in the first degree, forcible rape, or rape;
>
> (2) Statutory rape in the first degree;
>
> (3) Sodomy in the first degree, forcible sodomy, or sodomy;
>
> (4) Statutory sodomy in the first degree; or
>
> (5) An attempt to commit any of the felonies listed in this subsection. In such case, the sentence of imprisonment imposed for any felony listed in this subsection or an attempt to commit any of the aforesaid shall run

19

consecutively to the other sentences. The sentences imposed for any other offense may run concurrently.

Trial counsel was not ineffective for failing to argue that Johnson would be ineligible for concurrent terms of imprisonment as a form of substantial prejudice. Johnson does not cite any authority that a defendant's sentence pursuant to a mandatory sentencing statute is a form of "bias or discrimination" that would require severance. Rather, in assessing whether offenses should be severed, courts consider the number of the offenses charged, the complexity of the evidence, and the jury's ability to distinguish the evidence and to apply the law intelligently to each offense. *State v. Hyman*, 37 S.W.3d 384, 394 (Mo. App. W.D. 2001). We are not aware of any Missouri law that holds that section 558.026.1's requirement of consecutive sentencing is inapplicable when a defendant is convicted in separate, severed cases, or that a defendant is substantially prejudiced by being sentenced according to the applicable sentencing statute. Counsel's conduct does not fall below an objective level of reasonableness for failing to make a creative argument to the trial court unsupported by statute or caselaw.

Further, the motion court found that Johnson received consecutive sentences due to the nature of the crimes, and Johnson has not established that the trial court would have sentenced him to concurrent sentences if the offenses had been tried separately. In fact, the motion court held, "The Court, having presided over the entirety of the trial and the sentencing phase, would have ordered the sentences of rape and sodomy to run consecutively even if they had been tried in separate trials. [Johnson] received consecutive sentences because of the serious nature of the offenses, and because there were four

separate victims, not because the offenses were all joined in one trial." The circuit court did not clearly err in concluding that Johnson was not prejudiced by trial counsel's decision to not argue that Johnson was ineligible for concurrent sentences.

Point V is denied.

## Conclusion

For the foregoing reasons, the judgment of the motion court is affirmed.

_____
Gary D. Witt, Judge

All concur

21